# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

|  |  |
|---|---|
| **GREATGIGZ SOLUTIONS, LLC,** | |
| Plaintiff | **Case No. 6:20-cv-651** |
| v. | **JURY TRIAL DEMANDED** |
| **LYFT, INC.,** | |
| Defendant | |

## ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

GreatGigz Solutions, LLC ("Plaintiff") hereby files this Original Complaint for Patent Infringement against Lyft, Inc. ("Lyft" or "Defendant"), and alleges, on information and belief, as follows:

## THE PARTIES

1.  GreatGigz Solutions, LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business at 600 S. Dixie Highway, Suite 605, West Palm Beach, Florida 33401.

2.  On information and belief, Lyft, Inc. is a foreign for-profit corporation organized and existing under the laws of the State of Delaware, with a principal place of business in the State of California.  Lyft may be served through its registered agent in the State of Texas at CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.  On information and belief, Lyft sells and offers to sell products and services throughout the State of Texas, including in this judicial District, and introduces services via its infringing systems into the stream of

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

commerce knowing and intending that they would be extensively used in the State of Texas and in this judicial District.  On information and belief, Lyft specifically targets customers in the State of Texas and in this judicial District.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338.

4.      This Court has personal jurisdiction over Defendant.  Defendant has continuous and systematic business contacts with the State of Texas.  Defendant directly conducts business extensively throughout the State of Texas, by distributing, making, using, offering for sale, selling, and advertising (including the provision of interactive web pages and Mobile Applications) its services in the State of Texas and in this District.  Defendant has purposefully and voluntarily made its infringing systems available to residents of this District and into the stream of commerce with the intention and expectation that they will be purchased and used by consumers in this District.  On information and belief, Lyft: (i) employs more than 2 Million Independent Contractors; (ii) has completed more than 1 Billion rides; (iii) claims a 30% market share in the United States; and (iv) is valued at nearly $10 Billion.  *See* https://www.businessofapps.com/data/lyft-statistics/.[1]

5.      On information and belief, Lyft maintain a substantial and continuous business presence in this District, including an ongoing presence in Austin, Texas at 1021 East 7th Street, Suite 101, 78702.  In addition, on information and belief, Lyft maintains multiple Lyft Drivers Centers in this District which, on information and belief, are locations at which it provides services to Lyft Drivers.  *See* below.  The Lyft Drivers Centers are located in this District, at 6375 US Highway

---

[1] All references to Internet content, unless noted otherwise, are cited as of July 16, 2020, and as accessed from a location in the State of Texas.

290, Austin, Texas 78723, and at 8610 Broadway Street, Suite 260, San Antonio, Texas 78217.

*See* below.



*See* Google Map Image of Lyft Business Presence at 1021 East 7th Street, Suite 101, Austin, Texas.

## Austin                                    ^

### Driver Center

This location is now open.

Drivers are encouraged to schedule an appointment for support or service. Scheduling an appointment is strongly recommended. Walk-ins are still accepted but wait times may vary.

**Note**: Our in-person support locations no longer accept Lost and Found drop-offs. To learn what to do if you find an item in your car, check out our Help Center.

**Address**
6375 US-290 Austin, TX, 78723

**Operating Hours**
Monday-Friday, 9 AM-5 PM

*See* Lyft Hub Locator, at https://www.lyft.com/hub/hours/texas.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                    3

**San Antonio**                                                                ⌃

**Express Drive**

This location is now open.

**Address**
8610 Broadway St, Suite 260, San Antonio, TX 78217

**Operating Hours**
Monday-Friday, 9 AM-5 PM

*See* Lyft Hub Locator, at https://www.lyft.com/hub/hours/texas.

6.     On information and belief, Defendant maintains an ongoing and continuous business presence in the State of Texas and specifically within this District, which is illustrated by the fact that Lyft has 283 employees residing in the Austin, Texas area and within this District.   *See* Lyft corporate profile page on LinkedIn.com, which lists the location of Lyft employees worldwide, and specifically lists 283 such individual employees in the Austin, Texas area.   Among those employees are upper level individuals holding the following titles: (i) Operations Manager; (ii) Senior Manager; (iii) Regional Fleet Manager; (iv) Operations Lead; (v) Data Scientist; (vi) Fleet Operations Lead; and (vii) Analytics / Fraud, Risk & Strategy.   In addition to Austin, on information and belief, Lyft employs 139 individuals in San Antonio, 25 in Killeen/Temple, 19 in El Paso, and 14 in Waco, all of which are located in this judicial District.   *See* https://www.linkedin.com/company/lyft/people/?facetGeoRegion=us%3A64&keywords=texas.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                                                     4



7.     Venue is proper in the Western District of Texas as to Defendant pursuant to at least 28 U.S.C. §§ 1391(c)(2) and 1400(b).   As noted above, Defendant maintains a regular and established business presence in this District.

**PATENTS-IN-SUIT**

8.     GreatGigz Solutions, LLC is the owner, by assignment, of U.S. Patent Nos. 6.662,194 ("the '194 Patent"); 7,490,086 ("the '086 Patent"); 9,760,864 ("the '864 Patent"); and 10,096,000 ("the '000 Patent") (hereinafter collectively referred to as "the GGS Patents").

9.     The GGS Patents are valid, enforceable, and were duly issued in full compliance with Title 35 of the United States Code.

10.    The inventions described and claimed in the GGS Patents were invented by Raymond Anthony Joao.

11.   The GGS Patents each include numerous claims defining distinct inventions.

12.   The priority date of each of the GGS Patents is at least as early as July 31, 1999.  As of the priority date, the inventions as claimed were novel, non-obvious, unconventional, and non-routine.

13.   For example, and as evidence of the stated non-routine aspects of the inventions, during prosecution of the '864 Patent, the patent examiner considered whether the claims of the '864 Patent were eligible under 35 USC §101 in view of the United States Supreme Court's decision in *Alice*.  The patent examiner affirmatively and expressly found that the claims are in fact patent eligible under 35 USC §101 because all pending claims are directed to patent-eligible subject matter, because none of the pending claims are directed to an abstract idea, and because there would be no preemption of the abstract idea or the field of the abstract idea.

14.   GreatGigz Solutions, LLC alleges infringement on the part of Defendant of the '194 Patent, the '086 Patent, the '864 Patent, and the '000 Patent (collectively as the "Asserted Patents").

15.   The '194 Patent relates generally to an apparatus and method for providing recruitment information, including a memory device for Storing information regarding at least one of a job opening, a position, an assignment, a contract, and a project, and information regarding a job search request, a processing device for processing information regarding the job search request upon a detection of an occurrence of a searching event, wherein the processing device utilizes information regarding the at least one of a job opening, a position, an assignment, a contract, and a project, stored in the memory device, and further wherein the processing device generates a message containing information regarding at least one of a job opening, a position, an assignment, a contract, and a project, wherein the message is responsive to the job search

request, and a transmitter for transmitting the message to a communication device associated with an individual in real-time.  *See* Abstract, '194 Patent.

16.     The '086 Patent relates generally to an apparatus, including a memory device which stores information regarding a job opening, position, assignment, contract, or project, and information regarding a job search request or inquiry, a processing device which processing the information regarding a job search request or inquiry upon an automatic detection of an occurrence of a searching event which is an occurrence of a job posting, a posting of new or revised data or information, a news release of a business event, an employment-related event, an economic report, industry-specific news, an event which creates an to fill a position, or an event which creates an interest to seek a position, and generates a message, containing the information regarding a job opening, position, assignment, contract, or project, responsive to the job search request or inquiry, and a transmitter which transmits the message to a communication device associated with an individual.  *See* Abstract, '086 Patent.

17.     The '864 Patent relates generally to an apparatus, including a memory device for storing work schedule information or scheduling information for an individual, a transmitter for transmitting a job search request to a computer, wherein the computer is specially programmed for processing the job search request, for generating a message containing information regarding a job opening, a position, an assignment, a contract, or a project, and for transmitting the message to the apparatus in response to the job search request; a receiver for receiving the message; and a display for displaying at least some of the information contained in the message.  *See* Abstract, '864 Patent.

18.     The '000 Patent relates generally to an apparatus, including a memory which stores work schedule information or scheduling information for an employer, hiring entity, individual,

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                                    7

independent contractor, temporary worker, or freelancer; a receiver which receives a first request to obtain work schedule information or scheduling information for the employer, hiring entity, individual, independent contractor, temporary worker, or freelancer, and the first request is received from a first communication device; a processing device, specially programmed for processing information contained in the first request, generates a first message containing the work schedule or scheduling information for the employer, hiring entity, individual, independent contractor, temporary worker, or freelancer; and a transmitter for transmitting the first message to the first communication device or to a second communication device.   The apparatus processes information in a second request.  Information contained in the second request is based on the work schedule information or the scheduling information contained in the first message. *See* Abstract, '000 Patent.

19.  As noted, the claims of the Asserted Patents claim priority to at least July 31, 1999.  At that time, the idea of launching Lyft.com was still several years away.

20.  The claims of the Asserted Patents are not drawn to laws of nature, natural phenomena, or abstract ideas.  Although the systems and methods claimed in the Asserted Patents are ubiquitous now (and, as a result, are widely infringed), the specific combinations of elements, as recited in the claims, was not conventional or routine at the time of the invention.

21.  Further, the claims of the Asserted Patents contain inventive concepts which transform the underlying non-abstract aspects of the claims into patent-eligible subject matter.

22.  Consequently, the claims of the Asserted Patents recite systems and methods resulting in improved functionality of the claimed systems and represent technological improvements to the operation of computers.

23.    The claims of the Asserted Patents overcome deficiencies existing in the art as of the date of

invention, and comprise non-conventional approaches that transform the inventions as claimed

into substantially more than mere abstract ideas.  For example, as of the date of invention, "[j]ob

searching activities and recruitment activities typically require efforts in introducing parties to

one another, pre-screening the parties prior to, and/or subsequent to, an introduction, acting as an

information gathering entity for a party, exchanging information in order to determine if a

relationship is appropriate and/or desirable, negotiating a deal, and/or consummating a deal

between the respective parties.  While individuals and/or employers and/or hiring entities can act

on their own behalf during most of the process, one of the parties may typically enlist the efforts

of an employment agency or agencies, a recruiter(s), a so-called 'headhunter(s)', an employment

and/or career consultant(s), a temporary employment agency or agencies, a personal agent(s), a

personal manager(s), and/or another intermediary or intermediaries, sometimes at great

expense." '194 Patent at 1:59-2:6.  The inventions as claimed overcome these deficiencies in the

state of the art, and provide substantial cost savings to all parties.  As explained, as of the date of

invention, "[t]he enlistment of employment agencies, recruiters, so-called 'headhunters',

employment and/or career consultants, temporary employment agencies, personal agents,

personal managers, and/or other intermediaries, can be costly and can lead to job search efforts

and/or recruitment efforts which may be limited in breadth and/or scope by the personal and/or

individual contacts, limitations and/or constraints associated with the employment agency,

recruiter, so-called 'headhunter', employment and/or career consultant, temporary employment

agency, personal agent, personal manager, and/or other intermediary." *Id.* at 2:7-17.  As such,

the inventions as claimed provide non-conventional solutions to the conventional problems of the

day because the need for a costly middle-man in the process is overcome.  *Id.* at 2:18-24; 6:45-55.

24.    The inventions as claimed further overcome the deficiencies existing in the art as of the date of invention by removing barriers confronting many at the time.  As explained, as of the date of invention, "[j]ob searching efforts and recruitment efforts may be limited by and/or be constrained by limited personal contacts, geographical constraints, monetary constraints, and/or time constraints.  Oftentimes, individuals, employers and/or hiring entities, do not have the resources to conduct their own respective job searching efforts or recruitment efforts.  The enlistment of employment agencies, recruiters, so-called 'headhunters', employment and/or career consultants, temporary employment agencies, personal agents, personal managers, and/or other intermediaries, may not be sufficient to overcome these limitations and/or constraints, particularly, if the respective employment agency or agencies, recruiter(s), so-called 'headhunter(s)', employment and/or career consultant(s), temporary employment agency or agencies, personal agent(s), personal manager(s) and/or other intermediary or intermediaries, are working with similar limitations and/or constraints."  *Id.* at 2:26-42.  As such, the inventions as claimed provide non-conventional solutions to the conventional problems of the day because the need for extensive personal contacts and geographical proximity are overcome.

25.    The inventions as claimed further overcome the deficiencies existing in the art as of the date of invention by removing barriers confronting many at the time.  As explained, as of the date of invention, "[t]he job search process and/or the recruitment process can typically be rendered more difficult in instances when additional information may be requested by one or by both of the parties concerning a counterpart.  This typically results in time delays and/or additional expense to the party having to comply with such a request."  *Id.* at 2:43-48.  As such, the

inventions as claimed provide non-conventional solutions to the conventional problems of the day because the need for time-consuming delays is overcome.

26.     The inventions as claimed further overcome the deficiencies existing in the art as of the date of invention by removing barriers confronting many at the time.  As explained, as of the date of invention, "[j]ob searching efforts and/or recruitment efforts may further be rendered more difficult when the parties are not properly pre-screened, thereby resulting in wasted time and effort, and/or when the parties are not properly informed as to the needs and/or demands of a counterpart.   The needs and/or demands can include job description, job needs, project description, assignment description, salary, compensation, and/or other related information.  The failure to pre-screen the parties and/or to conduct a dialog and/or initiate interviews and/or discussions when the parties may be so far apart regarding their respective needs, requests and/or expectations, for example, those involving job duties and/or salary, can result in wasted time and effort." *Id.* at 2:49-61.  As such, the inventions as claimed provide non-conventional solutions to the conventional problems of the day because the associated time and effort are reduced, resulting in more efficient processes and cost savings for all involved.

27.     The inventions as claimed further overcome the deficiencies existing in the art as of the date of invention by removing barriers confronting many at the time.  As explained, as of the date of invention, "[c]onfidentiality is typically another concern in job searching activities and/or in recruitment activities.  Individuals, employees, and/or hiring entities may have an interest in, and/or a desire for, maintaining confidentiality during at least some initial stages of any job search and/or recruitment effort.  In some instances, once an initial interest is expressed, any confidentiality which may have existed may be lost for the remainder of the process. Sometimes, it may be desirable for an individual, an employer and/or hiring entity, to retain at

least some level of confidentiality and/or anonymity further into the job search and/or recruitment process.  In this manner, at least some confidentiality and/or anonymity can be preserved, especially if a deal between the parties is not ultimately reached." *Id.* at 2:62-3:8.  As such, the inventions as claimed provide non-conventional solutions to the conventional problems of the day because the need for confidentiality in the process is enhanced.  *See id.* at 6:59-65.

28.    As noted above, during prosecution of the '864 Patent, the patent examiner considered whether the claims of the '864 Patent were eligible under 35 USC §101 in view of the United States Supreme Court's decision in *Alice*.  The patent examiner expressly found that the claims are in fact patent eligible under 35 USC §101 because all pending claims are directed to patent-eligible subject matter, none of the pending claims are directed to an abstract idea, and there would be no preemption of the abstract idea or the field of the abstract idea.  For these same reasons, all of the claims of the Asserted Patents are patent-eligible.

29.    The '194 Patent was examined by Primary United States Patent Examiner Franz Colby.  During the examination of the '194 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: 705/1, 10, 11, 705/26, 707/104.1, 10, 3, and 103R.

30.    After conducting a search for prior art during the examination of the '194 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) 5,164,897, 11/1992, Clark et al.; (ii)  5,832,497, 11/1998, Taylor; (iii)  5,884.270, 3/1999, Walker et al.; (iv) 5,884.272, 3/1999, Walker et al.; (v) 5,978,768, 11/1999, McGovern et al.; (vi) 6,324,538, 11/2001, Wesinger, Jr. et al.; (vii) 6,332,125, 12/2001, Callen et al.; (viii) 6,363,376, 3/2002, Wiens et al.; (ix) 6,370,510, 4/2002, McGovern et al.; (x) 6,381,592, 4/2002, Reuning; and (xi) 6,385,620, 5/2002, Kurzius et al.

31.    After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '194 Patent to issue.  In so doing, it is presumed that Examiner Colby used his or her knowledge of the art when examining the claims. *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Colby has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).

32.    The '194 Patent is a pioneering patent, and has been cited as relevant prior art in over 250 subsequent United States Patent Applications, including Applications Assigned to such technology leaders as Ricoh, Robert Half International, IBM, Yahoo!, Oracle, Amazon, Monster, and CareerBuilder.

33.    The '086 Patent was examined by Primary United States Patent Examiner Jean M. Corrielus. During the examination of the '086 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: 707/104.1, 707/3, 10, 103R, 1, 2, 4, 5, 705/1, 10, 11, and 705/26.

34.    After conducting a search for prior art during the examination of the '086 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) 4,625,081, 11/1986, Lotito et al.; (ii) 5,164,897, 11/1992, Clark et al.; (iii) 5,978,768, 11/1999, McGovern et al.; (iv) 6,370,510, 4/2002, McGovern et al.; (v) 6,381,592, 4/2002, Reuning; (vi) 6,385,620, 5/2002, Kurzius et al.; (vii) 6,567,784, 5/2003, Bukow; (viii) 6,662,194, 12/2003, Joao; (ix) 6,873,964, 3/2005, Williams et al.; (x) 7,148,991, 12/2006, Suzuki et al.; and (xi) 2003/020531, 6/2003, Parker.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                             13

35.     After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '086 Patent to issue.  In so doing, it is presumed that Examiner Corrielus used his or her knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Corrielus has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).

36.     The '086 Patent is a pioneering patent, and has been cited as relevant prior art in over 250 subsequent United States Patent Applications, including Applications Assigned to such technology leaders as Xerox, Yahoo!, EDS, Microsoft, CareerBuilder, Monster, LinkedIn, and IBM.

37.     The '864 Patent was examined by Primary United States Patent Examiner Jean M. Corrielus. During the examination of the '864 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: 707/758.

38.     After conducting a search for prior art during the examination of the '864 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) 5,164,897, 11/1992, Clark; (ii) 5,758,324, 5/1998, Hartman; (iii) 5,832,497, 11/1998, Taylor; (iv) 5,862,223, 1/1999, Walker; (v) 5,884,270, 3/1999, Walker; (vi) 5,884,272, 3/1999, Walker; (vii) 5,978,768, 11/1999, McGovern; (viii) 6,157,808, 12/2000, Hollingsworth; (ix) 6,266,659, 7/2001, Nadkarni; (x) 6,370,510, 4/2002, McGovern; (xi) 6.381,592, 4/2002, Reuning; (xii) 6,398,556, 6/2002, Ho; (xiii) 6,408,337, 6/2002, Dietz; (xiv) 6,409,514, 6/2002, Bull; (xv) 6,466,91, 10/2002, Mitsuoka; (xvi) 6,718,340, 4/2004, Hartman;

(xvii)  6,873,964,  3/2005,  Williams;  (xviii)  7,054,821,  5/2006,  Rosenthal;  (xix)  7,305,347, 12/2007, Joao; (xx) 7,523,045, 4/2009, Walker; (xxi) 2001/0042000 Al, 11/2001, Defoor, Jr.; (xxii) 2002/0002476 A1, 1/2002, Mitsuoka; (xxiii) 2002/0152316 A1, 10/2002, Dietz; and (xxiv) 2005/0010467 A1, 1/2005, Dietz.

39.  After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '864 Patent to issue.  In so doing, it is presumed that Examiner Corrielus used his or her knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Corrielus has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).

40.  The '864 Patent is a pioneering patent, and has been cited as relevant prior art in over 250 subsequent  United  States  Patent  Applications,  including  Applications  Assigned  to  such technology leaders as Ricoh, Robert Half International, IBM, Yahoo!, Xerox, Amazon, Monster, HP, CareerBuilder, Microsoft, LinkedIn, and General Electric.

41.  The '000 Patent was examined by Primary United States Patent Examiner Jean M. Corrielus. During the examination of the '000 Patent, the United States Patent Examiner searched for prior art across multiple classifications.

42.  After conducting a search for prior art during the examination of the '000 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) 5,884,272, 3/1999, Walker; (ii) 6,266,659, 7/2001, Nadkarni; (iii)

6,370,510, 4/2002, McGovern; (iv) 6,457,005, 9/2002, Torrey, (v) 7,305,347, 12/2007, Joao; and (vi) 2002/0120532 A1, 8/2002, McGovern.

43.   After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '000 Patent to issue.  In so doing, it is presumed that Examiner Corrielus used his or her knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Corrielus has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).

44.   The '000 Patent is a pioneering patent, and has been cited as relevant prior art in over 250 subsequent United States Patent Applications, including Applications Assigned to such technology leaders as Ricoh, Robert Half International, General Electric, IBM, AT&T, HP, Yahoo!, Xerox, Monster, Amazon, CareerBuilder, Microsoft, Oracle, and LinkedIn.

45.   The claims of the Asserted Patents were all properly issued, and are valid and enforceable for the respective terms of their statutory life through expiration, and are enforceable for purposes of seeking damages for past infringement even post-expiration.  *See, e.g., Genetics Institute, LLC v. Novartis Vaccines and Diagnostics, Inc.,* 655 F.3d 1291, 1299 (Fed. Cir. 2011) ("[A]n expired patent is not viewed as having 'never existed.'  Much to the contrary, a patent does have value beyond its expiration date.  For example, an expired patent may form the basis of an action for past damages subject to the six-year limitation under 35 U.S.C. § 286") (internal citations omitted).

## THE ACCUSED INSTRUMENTALITIES

46.    On information and belief, Defendant makes, sells, advertises, offers for sale, uses, or otherwise
provides the Lyft website and its ancillary sites, including its various Mobile Applications
(including Lyft for Riders and Lyft Driver), in the United States.  The Lyft apparatus comprises
servers, hardware, software, and a collection of related and/or linked web pages and Mobile
Applications for providing job search and/or recruitment services to individuals (including riders,
job seekers, contractors, and employers) in the United States.  The Lyft system comprises an
apparatus with multiple interconnected infrastructures that infringe the Asserted Patents.  The
public-facing aspect of the Lyft apparatus is the Lyft website, which is available at
www.lyft.com, together with the associated Lyft Mobile Applications for Riders and Drivers,
respectively.  Collectively, all of the foregoing comprises the "Accused Instrumentalities."

## COUNT I
## Infringement of U.S. Patent No. 6,662,194

47.    Plaintiff incorporates the above paragraphs by reference.

48.    Defendant has been on actual notice of the '194 Patent at least as early as the date it received
service of this Original Complaint.

49.    On information and belief, Defendant owns and controls the operation of the Accused
Instrumentalities and generates substantial financial revenues therefrom.

50.    On information and belief, Defendant has directly infringed and continues to directly infringe at
least Claim 1 of the '194 Patent by making, using, importing, selling, and/or, offering for sale the
Accused Instrumentalities.

51.    The Accused Instrumentalities comprise an apparatus for providing recruitment information.
The infringing apparatus comprises servers, hardware, software, and a collection of related
and/or linked web pages and mobile applications for providing recruitment information and

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                                    17

services to individuals (including riders, job seekers, contractors, and employers) in the United States.  The apparatus comprises a memory device, a processing device, and a transmitter.  On information and belief, the Accused Instrumentalities comprise an apparatus built on the Amazon Web Services Platform, which is itself comprised of a multitude of components including the Lyft Multimodal Platform, Backend Platform Systems, Financial Applications, and the Lyft Website.  Further on information and belief, the Lyft Platform relies on the Amazon DynamoDB, which is a database for delivering high performance at scale.  Still further, on information and belief, Lyft leverages the Amazon Elastic Container Service for Kubernetes, and Amazon Lambda.  *See* https://www.businesswire.com/news/home/20190226005070/en/Lyft-All-In-AWS.

52.     On information and belief, the infringing Lyft apparatus further comprises a data lake on the Amazon Simple Storage Service (Amazon S3), which leverages Amazon Redshift to analyze the vast amount of data Lyft stores on the Cloud.  *Id.*  On information and belief, the Accused Instrumentalities comprise an apparatus with multiple interconnected infrastructures, including but not limited to multiple data centers, including Amazon Web Services data centers located across the United States.

53.     On information and belief, the infringing Lyft apparatus maintains and stores in memory real-time data with respect to the location of available (and soon-to-be available) Independent Contractors (*e.g.,* the drivers); the data includes at least information concerning the vehicle and present occupancy/capacity.  On information and belief, the Lyft apparatus further maintains and stores in memory real-time data concerning the location and needs of the hiring entity or employer (*e.g.,* the rider).  On information and belief, the infringing Lyft apparatus further filters all Independent Contractors by their respective GPS locations and capacities relative to the needs and location of the hiring entity (*e.g.*, the rider) in real-time; riders are then related to the most

appropriate Independent Contractors.  On information and belief, this "pairing" process is further informed by the estimated arrival time of the driver, as well as the mutual driver and rider preferences.  *See*  https://help.lyft.com/hc/en-us/articles/115012926847-How-drivers-and-passengers-are-paired.

 

*See* Lyft Passenger Tutorial, available at: https://www.youtube.com/watch?v=j0RDMLcmOgU.

54.     On information end belief, the infringing Lyft apparatus processes the relevant information as noted above in order to approximate arrival times, and delivers job notifications out to the Independent Contractors in order of priority until the opportunity is accepted.  Drivers are able to

perform job search queries by going into "Driver Mode" to "Go Online" as an available contractor for hire.



*See* How to Use Lyft Driver App Tutorial, at: https://www.youtube.com/watch?v=a8n2--HlzDU.

*See also,* Every Feature in Lyft Apps Explained, at https://www.ridesharingdriver.com/lyft-driver-and-passenger-app-features-explained/.

55.   On information and belief, the infringing Lyft apparatus comprises a multitude of databases to store the pertinent data, all of which are based on the Amazon Web Services Platform.   On information and belief, the Lyft Accused Instrumentalities comprise multiple data centers housing memory devices, processing devices, receivers, and transmitters.   On information and

belief, such data centers are located Worldwide. *See* above; *see also* https://aws.amazon.com/about-aws/global-infrastructure/.

56.    The Lyft Accused Instrumentalities comprise a memory device, which stores information regarding at least job openings, positions, assignments, and/or projects, which take the form of ride requests from users of the Lyft apparatus. Further, the infringing Lyft apparatus stores information regarding job search requests, which take the form of driver availability data and request polling from such drivers.

57.    The Lyft Accused Instrumentalities comprise a processor, which processes the information concerning the job search request in real-time, using the ride request information as provided by the employer or hiring entity (*i.e.,* the ride requestor). Each such request is an advertised job opening, position, assignment, contract, and/or project, which the individual Independent Contractor drivers can accept or decline, following receipt of the message in real-time (via the Lyft transmitter) concerning the available assignment via the Lyft Mobile Application for Drivers.

58.    The foregoing infringement on the part of Defendant has caused injury to Plaintiff. The amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '194 Patent.

59.    To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '194 Patent, such infringement is necessarily willful and deliberate. Plaintiff believes and contends that Defendant's continuance of its clear and inexcusable infringement of the '194 Patent post-notice is willful, wanton, malicious, bad-faith, deliberate, and/or consciously wrongful.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT         21

60. Including because of the foregoing, Plaintiff contends such activities by Defendant qualify this as an egregious case of misconduct beyond typical infringement, entitling Plaintiff to enhanced damages. Including based on the foregoing, Plaintiff requests an award enhanced damages, including treble damages, pursuant to 35 U.S.C. § 284.

61. Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

## COUNT II
### Infringement of U.S. Patent No. 7,490,086

62. Plaintiff incorporates the above paragraphs by reference.

63. Defendant has been on actual notice of the '086 Patent at least as early as the date it received service of this Original Complaint.

64. On information and belief, Defendant owns and controls the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

65. On information and belief, Defendant has directly infringed and continues to directly infringe at least Claim 18 of the '086 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.

66. The Accused Instrumentalities comprise an apparatus for providing recruitment information. The infringing apparatus comprises servers, hardware, software, and a collection of related and/or linked web pages and mobile applications for providing recruitment information and services to individuals (including riders, job seekers, contractors, and employers) in the United States. The apparatus comprises a memory device, a processing device, and a transmitter. On information and belief, the Accused Instrumentalities comprise an apparatus built on the Amazon Web Services Platform, which is itself comprised of a multitude of components including the Lyft Multimodal Platform, Backend Platform Systems, Financial Applications, and the Lyft

Website.  Further on information and belief, the Lyft Platform relies on the Amazon DynamoDB, which is a database for delivering high performance at scale.  Still further, on information and belief, Lyft leverages the Amazon Elastic Container Service for Kubernetes, and Amazon Lambda.  *See* above.

67.     On information and belief, the infringing Lyft apparatus further comprises a data lake on the Amazon Simple Storage Service (Amazon S3), which leverages Amazon Redshift to analyze the vast amount of data Lyft stores on the Cloud.  On information and belief, the Accused Instrumentalities comprise an apparatus with multiple interconnected infrastructures, including but not limited to multiple data centers, including Amazon Web Services data centers located across the United States.  *See* above.

68.     On information and belief, the infringing Lyft apparatus maintains and stores in memory real-time data with respect to the location of available (and soon-to-be available) Independent Contractors (*i.e.,* the drivers); the data includes at least information concerning the vehicle and present occupancy/capacity.  On information and belief, the Lyft apparatus further maintains and stores in memory real-time data concerning the location and needs of the hiring entity or employer (*i.e.,* the rider).  On information and belief, the infringing Lyft apparatus further filters all Independent Contractors by their respective GPS locations and capacities relative to the needs and location of the hiring entity (rider) in real-time; riders are then related to the most appropriate Independent Contractors.  On information and belief, this "pairing" process is further informed by the estimated arrival time of the driver, as well as the mutual driver and rider preferences.  *See* above.

69.     On information end belief, the infringing Lyft apparatus processes the relevant information as noted above in order to approximate arrival times, and delivers job notifications out to the

Independent Contractors in order of priority until the opportunity is accepted.  Drivers are able to perform job search queries by going into "Driver Mode" to "Go Online" as an available contractor for hire.  *See* above.

70.    On information and belief, the infringing Lyft apparatus comprises a multitude of databases to store the pertinent data, all of which are based on the Amazon Web Services Platform.  On information and belief, the Lyft Accused Instrumentalities comprise multiple data centers housing memory devices, processing devices, receivers, and transmitters.  On information and belief, such data centers are located Worldwide.  *See* above.

71.    The Lyft Accused Instrumentalities comprise a memory device, which stores information regarding individuals available for applying for a job opportunity or hiring need.  On information and belief, the Lyft memory device stores information concerning drivers who are available and willing to accept assignments within the Lyft network.  Each such driver, on information and belief, is employed by Lyft as an Independent Contractor and is retained by users of the Lyft apparatus to perform specific, defined tasks for the benefit of the user.  *See* above.

72.    The Lyft Accused Instrumentalities store work schedule information for each such driver (independent contractor) by virtue of the driver's "Online" availability, which is indicated via the Lyft Driver Mobile Application.  *See* above.

73.    The Lyft Accused Instrumentalities comprise a processing device which automatically detects searching events, which occur when a user of the Lyft apparatus completes a Ride Request.  Each such Request comprises a job posting for Lyft drivers, and otherwise comprises an event which creates an interest in an individual (the driver) to seek and accept the position.  *See* above.

74.    The Lyft Accused Instrumentalities comprise a processing device which generates a message containing information regarding the individual (including but not limited to, availability,

proximity, acceptance, identity, photo, estimated time of arrival, and location).  The message is transmitted to the user (employer or hiring entity) via the Lyft Mobile Application or via the Lyft website.  *See* above and below:




*See* Lyft Passenger Tutorial, available at: https://www.youtube.com/watch?v=j0RDMLcmOgU.

75.     The foregoing infringement on the part of Defendant has caused injury to Plaintiff.  The amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '086 Patent.

76.     To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '086 Patent, such infringement is necessarily willful and deliberate.   Plaintiff believes and contends that Defendant's continuance of its clear and inexcusable infringement of the '086 Patent post-notice is willful, wanton, malicious, bad-faith, deliberate, and/or consciously wrongful.

77.     Including because of the foregoing, Plaintiff contends such activities by Defendant qualify this as an egregious case of misconduct beyond typical infringement, entitling Plaintiff to enhanced damages.   Including based on the foregoing, Plaintiff requests an award enhanced damages, including treble damages, pursuant to 35 U.S.C. § 284.

78.     Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

### COUNT III
### Infringement of U.S. Patent No. 9,760,864

79.     Plaintiff incorporates the above paragraphs by reference.

80.     On information and belief, Defendant owns and controls the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

81.     On information and belief, Defendant has directly infringed at least Claim 1 of the '864 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.

82.     The Accused Instrumentalities comprise an apparatus for providing recruitment information. The infringing apparatus comprises servers, hardware, software, and a collection of related and/or linked web pages and mobile applications for providing recruitment information and services to individuals (including riders, job seekers, contractors, and employers) in the United States.   The apparatus comprises a memory device, a processing device, and a transmitter.   On information and belief, the Accused Instrumentalities comprise an apparatus built on the Amazon

Web Services Platform, which is itself comprised of a multitude of components including the Lyft Multimodal Platform, Backend Platform Systems, Financial Applications, and the Lyft Website.  Further on information and belief, the Lyft Platform relies on the Amazon DynamoDB, which is a database for delivering high performance at scale.  Still further, on information and belief, Lyft leverages the Amazon Elastic Container Service for Kubernetes, and Amazon Lambda.  *See* above.

83.     On information and belief, the infringing Lyft apparatus further comprises a data lake on the Amazon Simple Storage Service (Amazon S3), which leverages Amazon Redshift to analyze the vast amount of data Lyft stores on the Cloud.  On information and belief, the Accused Instrumentalities comprise an apparatus with multiple interconnected infrastructures, including but not limited to multiple data centers, including Amazon Web Services data centers located across the United States.  *See* above.

84.     On information and belief, the infringing Lyft apparatus maintains and stores in memory real-time data with respect to the location of available (and soon-to-be available) Independent Contractors (*i.e.,* the drivers); the data includes at least information concerning the vehicle and present occupancy/capacity.  On information and belief, the Lyft apparatus further maintains and stores in memory real-time data concerning the location and needs of the hiring entity or employer (*i.e.,* the rider).  On information and belief, the infringing Lyft apparatus further filters all Independent Contractors by their respective GPS locations and capacities relative to the needs and location of the hiring entity (rider) in real-time; riders are then related to the most appropriate Independent Contractors.  On information and belief, this "pairing" process is further informed by the estimated arrival time of the driver, as well as the mutual driver and rider preferences.  *See* above.

85.   On information end belief, the infringing Lyft apparatus processes the relevant information as noted above in order to approximate arrival times, and delivers job notifications out to the Independent Contractors in order of priority until the opportunity is accepted.  Drivers are able to perform job search queries by going into "Driver Mode" to "Go Online" as an available contractor for hire.  *See* above.

86.   On information and belief, the infringing Lyft apparatus comprises a multitude of databases to store the pertinent data, all of which are based on the Amazon Web Services Platform.  On information and belief, the Lyft Accused Instrumentalities comprise multiple data centers housing memory devices, processing devices, receivers, and transmitters.  On information and belief, such data centers are located Worldwide.  *See* above.

87.   The Lyft Accused Instrumentalities comprise a memory device, which stores information regarding individuals available for applying for a job opportunity or hiring need.  On information and belief, the Lyft memory device stores information concerning drivers who are available and willing to accept assignments within the Lyft network.  Each such driver, on information and belief, is employed by Lyft as an Independent Contractor and is retained by users of the Lyft apparatus to perform specific, defined tasks for the benefit of the user.  *See* above.

88.   The Lyft Accused Instrumentalities store work schedule information for each such driver (independent contractor) by virtue of the driver's "Online" availability, which is indicated via the Lyft Driver Mobile Application.  *See* above.

89.   The Lyft Accused Instrumentalities comprise a receiver for receiving a first request from a communication device associated with a hiring entity (*e.g.,* the user of the Lyft Mobile App for Riders and/or the user of the Lyft web page at www.lyft.com).  On information and belief, when a user seeks to place a Ride Request using the Lyft apparatus, a first request is generated to

obtain the work schedule information for the known available Independent Contractors in order to generate an Estimated Time for Performance and populate the mapping function.   If acceptable, the user has the option of placing the formal Request and completing the transaction. *See* above.

90.   On information and belief, when a user completes a formal Ride Request using the Lyft Accused Instrumentalities, the Request comprises a Second Request to engage and obtain the Lyft Independent Contractor in the vicinity, and to thereafter complete the ride transaction.   On information and belief, the Independent Contractor Drivers are notified via "push notification" when a new ride opportunity is available, based on their proximity and capacity.   If the initial driver does not timely respond by accepting the position, it is passed to the next available driver for consideration.   Ultimately, the Second Request is confirmed, and the user is then provided with arrival information, including driver and vehicle data in real-time.  *See* above.

91.   The foregoing infringement on the part of Defendant has caused injury to Plaintiff.  The amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '864 Patent.

92.   Based on the foregoing, Plaintiff requests an award enhanced damages, including treble damages, pursuant to 35 U.S.C. § 284.

93.   Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

## COUNT IV
## Infringement of U.S. Patent No. 10,096,000

94.   Plaintiff incorporates the above paragraphs by reference.

95.     On information and belief, Defendant owns and controls the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

96.     On information and belief, Defendant has directly infringed at least Claim 1 of the '000 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.

97.     The Accused Instrumentalities comprise an apparatus for providing recruitment information. The infringing apparatus comprises servers, hardware, software, and a collection of related and/or linked web pages and mobile applications for providing recruitment information and services to individuals (including riders, job seekers, contractors, and employers) in the United States.  The apparatus comprises a memory device, a processing device, and a transmitter.  On information and belief, the Accused Instrumentalities comprise an apparatus built on the Amazon Web Services Platform, which is itself comprised of a multitude of components including the Lyft Multimodal Platform, Backend Platform Systems, Financial Applications, and the Lyft Website.  Further on information and belief, the Lyft Platform relies on the Amazon DynamoDB, which is a database for delivering high performance at scale.  Still further, on information and belief, Lyft leverages the Amazon Elastic Container Service for Kubernetes, and Amazon Lambda.  *See* above.

98.     On information and belief, the infringing Lyft apparatus further comprises a data lake on the Amazon Simple Storage Service (Amazon S3), which leverages Amazon Redshift to analyze the vast amount of data Lyft stores on the Cloud.  On information and belief, the Accused Instrumentalities comprise an apparatus with multiple interconnected infrastructures, including but not limited to multiple data centers, including Amazon Web Services data centers located across the United States.  *See* above.

99.     On information and belief, the infringing Lyft apparatus maintains and stores in memory real-time data with respect to the location of available (and soon-to-be available) Independent Contractors (*i.e.,* the drivers); the data includes at least information concerning the vehicle and present occupancy/capacity.  On information and belief, the Lyft apparatus further maintains and stores in memory real-time data concerning the location and needs of the hiring entity or employer (*i.e.,* the rider).  On information and belief, the infringing Lyft apparatus further filters all Independent Contractors by their respective GPS locations and capacities relative to the needs and location of the hiring entity (rider) in real-time; riders are then related to the most appropriate Independent Contractors.  On information and belief, this "pairing" process is further informed by the estimated arrival time of the driver, as well as the mutual driver and rider preferences.  *See* above.

100.    On information end belief, the infringing Lyft apparatus processes the relevant information as noted above in order to approximate arrival times, and delivers job notifications out to the Independent Contractors in order of priority until the opportunity is accepted.  Drivers are able to perform job search queries by going into "Driver Mode" to "Go Online" as an available contractor for hire.  *See* above.

101.    On information and belief, the infringing Lyft apparatus comprises a multitude of databases to store the pertinent data, all of which are based on the Amazon Web Services Platform.  On information and belief, the Lyft Accused Instrumentalities comprise multiple data centers housing memory devices, processing devices, receivers, and transmitters.  On information and belief, such data centers are located Worldwide.  *See* above.

102.    The Lyft Accused Instrumentalities comprise a memory device, which stores information regarding individuals available for applying for a job opportunity or hiring need.  On information

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                                          31

and belief, the Lyft memory device stores information concerning drivers who are available and willing to accept assignments within the Lyft network.  Each such driver, on information and belief, is employed by Lyft as an Independent Contractor and is retained by users of the Lyft apparatus to perform specific, defined tasks for the benefit of the user.  *See* above.

103.    The Lyft Accused Instrumentalities store work schedule information for each such driver (independent contractor) by virtue of the driver's "Online" availability, which is indicated via the Lyft Driver Mobile Application.  *See* above.

104.    The Lyft Accused Instrumentalities comprise a receiver for receiving a first request from a communication device associated with a hiring entity (*e.g.,* the user of the Lyft Mobile App for Riders or, in the alternative, users of the Lyft web page at www.lyft.com).  On information and belief, when a user seeks to place a Ride Request using the Lyft apparatus, a first request is generated to obtain the work schedule information for the known available Independent Contractors in order to generate an Estimated Time for Performance and populate the mapping function.  If acceptable, the user has the option of placing the formal Request and completing the transaction.  *See* above.

105.    On information and belief, when a user completes a formal Ride Request using the Lyft Accused Instrumentalities, the Request comprises a Second Request to engage and obtain the Lyft Independent Contractor in the vicinity, and to thereafter complete the ride transaction.  On information and belief, the Independent Contractor Drivers are notified via "push notification" when a new ride opportunity is available, based on their proximity and capacity.  If the initial driver does not timely respond by accepting the position, it is passed to the next available driver for consideration.  Ultimately, the Second Request is confirmed, and the user is then provided with arrival information, including driver and vehicle data in real-time.  *See* above.

106.    The foregoing infringement on the part of Defendant has caused injury to Plaintiff.  The amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '000 Patent.

107.    Based on the foregoing, Plaintiff requests an award enhanced damages, including treble damages, pursuant to 35 U.S.C. § 284.

108.    Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, GreatGigz Solutions, LLC respectfully requests the Court enter judgment against Defendant as follows:

1.    Declaring that Defendant has infringed each of the Asserted Patents;

2.    Awarding GreatGigz Solutions, LLC its damages suffered because of Defendant's infringement of the Asserted Patents;

3.    Awarding GreatGigz Solutions, LLC its costs, attorneys' fees, expenses, and interest;

4.    Awarding GreatGigz Solutions, LLC ongoing post-trial royalties; and

5.    Granting GreatGigz Solutions, LLC such further relief as the Court finds appropriate.

## JURY DEMAND

GreatGigz Solutions, LLC demands trial by jury, under Fed. R. Civ. P. 38.

Dated: July 17, 2020                            Respectfully Submitted

*/s/ Thomas Fasone III*
Thomas Fasone III
Texas Bar No. 00785382
tfasone@ghiplaw.com
M. Scott Fuller
Texas Bar No. 24036607
sfuller@ghiplaw.com

**GARTEISER HONEA, PLLC**
119 W. Ferguson Street
Tyler, Texas 75702
Telephone: (903) 705-7420
Facsimile: (888) 908-4400

Raymond W. Mort, III
Texas State Bar No. 00791308
raymort@austinlaw.com
**THE MORT LAW FIRM, PLLC**
100 Congress Ave, Suite 2000
Austin, Texas 78701
Tel/Fax: (512) 865-7950

**ATTORNEYS FOR**
**GREATGIGZ SOLUTIONS, LLC**

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT           34